### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| HARRY KNOPP, individually and on behalf of all others similarly situated,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>FRONTIER COMMUNICATIONS PARENT, INC.,<br><br>　　　　　Defendant. | Case No.: 3:24-cv-01501<br><br><br><br><br>**JURY TRIAL DEMANDED** |

### CLASS ACTION COMPLAINT

Plaintiff HARRY KNOPP ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action against Defendant FRONTIER COMMUNICATIONS PARENT, INC. ("Defendant" or "Frontier"), and alleges as follows:

### JURISDICTION AND VENUE

1.　　This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the proposed Class who are diverse from Defendant, and (4) there are more than 100 proposed Class members. Plaintiff is a citizen of West Virgina.  Defendant is a citizen of Texas.

2.　　This Court has general personal jurisdiction over Defendant because Defendant is a resident and citizen of the Dallas Division of the Northern District of Texas, Defendant conducts substantial business in this district, Defendant has its principal place of business in this District, and the events giving rise to Plaintiff's claims arise out of Defendant's contacts with this district.

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is a resident and citizen of the Dallas Division of the Northern District of Texas.

**PARTIES**

4.      Plaintiff Harry Knopp is a resident and citizen of West Virginia.

5.      Defendant Frontier Communications Parent, Inc. is a Texas corporation with its principal place of business located at 1919 McKinney Avenue, Dallas, Texas, 75201. The registered agent for service of process is Corporation Service Company d/b/a CSC – Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

**FACTUAL ALLEGATIONS**

**Frontier**

6.      Defendant Frontier represents that it is "the largest pure-play fiber provider in the United States,"[1] that provides internet services to residential and corporate consumers.[2]

7.      Defendant's Privacy Policy represents that "Protecting the privacy of our customers is important to Frontier."[3]

8.      Frontier's Privacy Policy further represents that they "use reasonable technical, administrative, and physical safeguards to protect against unauthorized access to, use of, or disclosure of the personal information [they] collect and store," and that "[p]ersonally identifiable and other sensitive records are retained only as long as reasonably necessary for business, accounting, tax, or legal purposes."[4]

9.      Plaintiff and Class members are customers of Defendant.

---

[1] *See* https://www.linkedin.com/company/frontier-communications. (last accessed June 14, 2024).
[2] *See* https://frontier.com/shop. (last accessed June 14, 2024).
[3] *See* https://frontier.com/corporate/privacy-policy. (last accessed June 14, 2024).
[4] *Id.*

2

10.    Plaintiff and Class members provided certain Personally Identifying Information ("PII") to Defendant.

11.    As a sophisticated internet service provider with an acute interest in maintaining the confidentiality of the PII entrusted to it, Defendant is well-aware of the numerous data breaches that have occurred throughout the United States and its responsibility for safeguarding PII in its possession.

**The Data Breach**

12.    According to Defendant, on April 14, 2024, Defendant "detected unauthorized access to some of [their] internal IT systems," which resulted in their customers' PII being accessed by a "third party." ("the Data Breach").[5]

13.    Defendant claims that it "retained leading cybersecurity experts to support the investigation and contain the incident," and that they "took steps to further strengthen [their] network security and prevent further access by the third party" after discovering the Data Breach.[6]

14.    Defendant claims to have identified Plaintiff and Class members as individuals whose PII was accessed by an unauthorized actor on April 14, 2024.[7]

15.    The compromised data includes affected persons' full names, Social Security numbers, and Dates of Birth.[8]

16.    According to a notice of data breach filed with the Attorney General of Maine, the Data Breach has affected 751,895 individuals.[9]

---

[5] *See* Data Breach Notification Letter, attached hereto as Exhibit 1.
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *See* Data Breach Notifications, Office of the Maine Attorney General, https://apps.web.maine.gov/online/aeviewer/ME/40/8391c11f-2946-414a-bdc1-6ceff4ae0caa.shtml.

17.     Defendant notified the Securities and Exchange Commission ("SEC") that a "third party gained unauthorized access to portions of its information technology environment" on April 15, 2024.[10]

18.     In its filing with the SEC, Defendant stated that it "determined that the third party was likely a cybercrime group, which gained access to, among other information, personally identifiable information."[11]

19.     A ransomware group named, "RansomHub" claimed responsibility for the Data Breach on June 1, 2024, through a public online posting.[12]

20.     RansomHub's message boasted that they obtained 5 gigabytes worth of data belonging to "more than 2 million [Frontier] customer[s]," including their addresses, names, Social Security numbers, credit scores, dates of birth, and phone numbers.[13]

21.     RansomHub went on to claim that they "gave [F]rontier 2 months to contact us but they don't care about clients [sic] data. Below is a screenshot of the data."[14]

22.     RansomHub concluded their public message by offering to sell affected individuals' data to the highest bidder.[15]

23.     Defendant began notifying affected persons on June 6, 2024.[16]

24.     Defendant's letter offered free credit monitoring services to those potentially impacted by the breach.

---

[10] *See* Frontier Communications Parent, Inc., Form 8-K, https://www.sec.gov/Archives/edgar/data/20520/000119312524100764/d784189d8k.htm.
[11] *Id.*
[12] *See* https://securityaffairs.com/164126/data-breach/ransomhub-gang-hacked-frontier-communications.html (Last accessed June 14, 2024).
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*

25.     Defendant's letter provided those potentially affected by the Data Breach with a document outlining "Steps [They] Can Take to Help Protect Personal Information."[17]

26.     Defendant's letter to affected individuals made no reference to a "cybercrime group" being suspected as the third party that gained access to affected individuals' PII.

27.     Defendant's letter to affected individuals, nor its filings to the SEC, made mention of the ransom placed on affected individuals' PII.

28.     Defendant did not state why it was unable to prevent the Data Breach or which security feature failed.

29.     Defendant did not state why it did not contact affected individuals about the Data Breach until nearly two months after they were identified.

30.     Defendant did not state why it informed the SEC of the Data Breach within one day of the Data Breach but waited nearly two months to inform affected individuals.

31.     Defendant failed to prevent the data breach because it did not adhere to commonly accepted security standards and failed to detect that its databases were subject to a security breach.

**Injuries to Plaintiff and the Class**

32.     On or around June 6, 2024, Plaintiff received a breach notification from Defendant indicating that his Personally Identifiable Information ("PII") was compromised during the Data Breach.[18]  According to the notification letter, the Data Breach exposed Plaintiff's name, Date of Birth, and Social Security number.

33.     After the Data Breach, Plaintiff received multiple phone calls from anonymous callers who threatened to leak his PII if he did not send them a demanded sum of money.

---

[17] *See* Exhibit 1.
[18] *See* Exhibit 1.

34.    In response to the threatening calls he has received, which were a result of the Data Breach, Plaintiff has removed all of the monies from his bank account on the first day of every month.[19]

35.    Plaintiff has spent uncompensated time ordering a replacement credit card, which took one week to arrive.

36.    Plaintiff has suffered severe emotional distress and anxiety since receiving the threatening phone calls and has spent significant amounts of uncompensated time monitoring his bank account.

37.    Plaintiff is very concerned about the theft of his PII and has and will continue to spend substantial amounts of uncompensated time and energy monitoring her credit status.

38.    As a direct and proximate result of Defendant's actions and omissions in failing to protect Plaintiff's PII, Plaintiff and the Class have been damaged.

39.    Plaintiff and the Class have been placed at a substantial risk of harm in the form of credit fraud or identity theft and have incurred and will likely incur additional damages, including spending substantial amounts of time monitoring accounts and records, in order to prevent and mitigate credit fraud, identity theft, and financial fraud.

40.    In addition to the irreparable damage that may result from the theft of PII, identity theft victims must spend numerous hours and their own money repairing the impacts caused by this breach. After conducting a study, the Department of Justice's Bureau of Justice Statistics found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" and resolving the consequences of fraud in 2014.[20]

---

[19] Notably, Plaintiff receives Social Security Disability Insurance payments which are sent to his bank account on the first day of each month.
[20] U.S. Dep't of Justice, *Victims of Identity Theft, 2014* (Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf.

41.     In addition to fraudulent charges and damage to their credit, Plaintiff and the Class will spend substantial time and expense (a) monitoring their accounts to identify fraudulent or suspicious charges; (b) cancelling and reissuing cards; (c) purchasing credit monitoring and identity theft prevention services; (d) attempting to withdraw funds linked to compromised, frozen accounts; (e) removing withdrawal and purchase limits on compromised accounts; (f) communicating with financial institutions to dispute fraudulent charges; (g) resetting automatic billing instructions and changing passwords; (h) freezing and unfreezing credit bureau account information; (i) cancelling and re-setting automatic payments as necessary; (j) paying late fees and declined payment penalties as a result of failed automatic payments; and (k) managing the severe anxiety that has been caused by their being personally threatened.

42.     Plaintiff and the Class have suffered severe emotional distress as a result of their PII being compromised and will continue to suffer for an indefinite period of time. Since Plaintiff and the Class may not change their Social Security numbers, their heightened risk of becoming victims of fraud is now permanent. Plaintiff and the Class will remain aware of both this permanent risk as well as their permanent inability to cure that risk until it manifests itself in the form of fraud.

43.     Additionally, Plaintiff and the Class have suffered or are at increased risk of suffering from, *inter alia*, the loss of the opportunity to control how their PII is used, the diminution in the value and/or use of their PII entrusted to Defendant, and loss of privacy.

**The Value of PII**

44.     It is well known that PII, and financial account information in particular, is an invaluable commodity and a frequent target of hackers.

45.     According to Javelin Strategy & Research, in 2017 alone over 16.7 million individuals were affected by identity theft, causing $16.8 billion to be stolen.[21]

46.     People place a high value not only on their PII, but also on the privacy of that data. This is because identity theft causes "significant negative financial impact on victims" as well as severe distress and other strong emotions and physical reactions.[22]

47.     People are particularly concerned with protecting the privacy of their financial account information and social security numbers, which are the "secret sauce" that is "as good as your DNA to hackers."[23] There are long-term consequences to data breach victims whose social security numbers are taken and used by hackers. Even if they know their social security numbers have been accessed, Plaintiff and Class members cannot obtain new numbers unless they become a victim of social security number misuse. Even then, the Social Security Administration has warned that "a new number probably won't solve all [] problems … and won't guarantee … a fresh start."[24] The Social Security Administration's reactive security measures make Plaintiff and Class Members especially prone to severe anxiety and emotional distress. Victims of a data breach must remain conscious of their vulnerability of identity theft, awaiting nefarious use of their social security information, while knowing they may not receive protection from that misuse until after it has occurred.

---

[21] Javelin Strategy & Research, *Identity Fraud Hits All Time High With 16.7 Million U.S. Victims in 2017, According to New Javelin Strategy & Research Study* (Feb. 6, 2018), https://www.javelinstrategy.com/press-release/identity-fraud-hits-all-time-high-167-million-us-victims-2017-according-new-javelin.
[22] Identity Theft Resource Center, *Identity Theft: The Aftermath 2017*, https://www.ftc.gov/system/files/documents/public_comments/2017/10/00004-141444.pdf.
[23] Cameron Huddleston, *How to Protect Your Kids From the Anthem Data Breach*, Kiplinger, (Feb. 10, 2015), https://www.kiplinger.com/article/credit/T048-C011-S001-how-to-protect-your-kids-from-the-anthem-data-brea.html.
[24] Social Security Admin., *Identity Theft and Your Social Security Number*, at 6-7, https://www.ssa.gov/pubs/EN-05-10064.pdf.

48.     Defendant acknowledged the immense value of that PII had to Plaintiff and the Class insofar as they sent them a document outlining "Steps You Can Take To Help Protect Personal Information" and provided them with a year of credit monitoring services. However, the provision of credit monitoring services is abbreviated, and the document that guides Plaintiff and the Class in protecting their PII serves to emphasize that Defendant has placed the onus on those affected to retain the value of their PII.

**Industry Standards for Data Security**

49.     In light of the numerous high-profile data breaches targeting companies like Target, Neiman Marcus, eBay, Anthem, Deloitte, Equifax, and Capital One, Defendant is, or reasonably should have been, aware of the importance of safeguarding PII, as well as of the foreseeable consequences of its systems being breached.

50.     Security standards commonly accepted among businesses that store PII using the internet include, without limitation:

    a.   Maintaining a secure firewall configuration;

    b.   Monitoring for suspicious or irregular traffic to servers;

    c.   Monitoring for suspicious credentials used to access servers;

    d.   Monitoring for suspicious or irregular activity by known users;

    e.   Monitoring for suspicious or unknown users;

    f.   Monitoring for suspicious or irregular server requests;

    g.   Monitoring for server requests for PII;

    h.   Monitoring for server requests from VPNs; and

    i.   Monitoring for server requests from Tor exit nodes.

51.    The U.S. Federal Trade Commission ("FTC") publishes guides for businesses for cybersecurity[25] and protection of PII[26] which includes basic security standards applicable to all types of businesses.

52.    The FTC recommends that businesses:

a.    Identify all connections to the computers where you store sensitive information.

b.    Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

c.    Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business.

d.    Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

e.    Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks

f.    Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet.

g.    Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically.

---

[25] Start with Security: A Guide for Business, FTC (June 2015),
https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.
[26] Protecting Personal Information: A Guide for Business, FTC (Oct. 2016),
https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting personalinformation.pdf.

h. Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day.

i. Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

53.    The FTC has also issued guidance on reactive measures entities should take after they have suffered a data breach. Notably, the FTC advises that such entities should not "make misleading statements about the breach" or "withhold key details that might help consumers protect themselves and their information."[27]

54.    Defendant failed to adhere to the FTC's guidance in their communications with affected individuals after the Data Breach occurred, as it withheld the "key detail" that affected individuals' PII was held for ransom by a known ransomware group.

55.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[28]

56.    Because Defendant was entrusted with consumers' PII, it had, and has, a duty to consumers to keep their PII secure.

---

[27] Federal Trade Commission, *Data Breach Response: A Guide for Business,* https://www.ftc.gov/business-guidance/resources/data-breach-response-guide-business.
[28] Federal Trade Commission, *Privacy and Security Enforcement: Press Releases*, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement.

57.     Consumers, such as Plaintiff and the Class, reasonably expect that when they provide PII to companies or when those companies forward their PII to companies such as Defendant, that their PII will be safeguarded.

58.     Nonetheless, Defendant failed to prevent the Data Breach. Had Defendant properly maintained and adequately protected its systems, it could have prevented the Data Breach.

## CLASS ACTION ALLEGATIONS

59.     Plaintiff, individually and on behalf of all others, brings this class action pursuant to Fed. R. Civ. P. 23.

60.     The proposed Class are defined as follows:

> All persons whose PII was maintained on Defendant's servers and was compromised in the Data Breach.

61.     Plaintiff reserves the right to modify, change, or expand the definitions of the proposed Class based upon discovery and further investigation.

62.     *Numerosity*: The proposed Class is so numerous that joinder of all members is impracticable. Although the precise number is not yet known to Plaintiff, Defendant has reported that the number of persons affected by the Data Breach is 158,593 individuals.[29] The Class members can be readily identified through Defendant's records.

63.     *Commonality*: Questions of law or fact common to the Class include, without limitation:

a.   Whether Defendant owed a duty or duties to Plaintiff and the Class to exercise due care in collecting, storing, safeguarding, and obtaining their PII;

b.   Whether Defendant breached that duty or those duties;

---

[29] *See* Data Breach Notifications, Office of the Maine Attorney General, https://apps.web.maine.gov/online/aeviewer/ME/40/1adfdecc-df2a-47a6-93bc-ef5a7ad1ac7a.shtml

c.  Whether Defendant failed to establish appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of records to protect against known and anticipated threats to security;

d.  Whether the security provided by Defendant was satisfactory to protect customer information as compared to industry standards;

e.  Whether Defendant misrepresented or failed to provide adequate information to customers regarding the type of security practices used;

f.  Whether Defendant knew or should have known that it did not employ reasonable measures to keep Plaintiff's and the Class's PII secure and prevent loss or misuse of that PII;

g.  Whether Defendant acted negligently in connection with the monitoring and protecting of Plaintiff's and Class's PII;

h.  Whether Defendant's conduct was intentional, willful, or negligent;

i.  Whether Defendant violated any and all statutes and/or common law listed herein;

j.  Whether the Class suffered damages as a result of Defendant's conduct, omissions, or misrepresentations; and

k.  Whether the Class is entitled to injunctive, declarative, and monetary relief as a result of Defendant's conduct.

64.     *Typicality*: The claims or defenses of Plaintiff are typical of the claims or defenses of the Class. Class members were injured and suffered damages in substantially the same manner as Plaintiff, Class members have the same claims against Defendant relating to the same course of conduct, and Class members are entitled to relief under the same legal theories asserted by Plaintiff.

65.     *Adequacy*: Plaintiff will fairly and adequately protect the interests of the proposed Class and has no interests antagonistic to those of the proposed Class. Plaintiff has retained counsel experienced in the prosecution of complex class actions including, but not limited to, data breaches.

66. *Predominance*: Questions of law or fact common to proposed Class members predominate over any questions affecting only individual members. Common questions such as whether Defendant owed a duty to Plaintiff and the Class and whether Defendant breached its duties predominate over individual questions such as measurement of economic damages.

67. *Superiority*: A class action is superior to other available methods for the fair and efficient adjudication of these claims because individual joinder of the claims of the Class is impracticable. Many members of the Class are without the financial resources necessary to pursue this matter. Even if some members of the Class could afford to litigate their claims separately, such a result would be unduly burdensome to the courts in which the individualized cases would proceed. Individual litigation increases the time and expense of resolving a common dispute concerning Defendant's actions toward an entire group of individuals. Class action procedures allow for far fewer management difficulties in matters of this type and provide the unique benefits of unitary adjudication, economies of scale, and comprehensive supervision over the entire controversy by a single judge in a single court.

68. *Manageability*: Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

69. The Class may be certified pursuant to Rule 23(b)(2) because Defendant has acted on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

70. The Class may also be certified pursuant to Rule 23(b)(3) because questions of law and fact common to the Class will predominate over questions affecting individual members, and a class action is superior to other methods for fairly and efficiently adjudicating the controversy and causes of action described in this Complaint.

71.     Particular issues under Rule 23(c)(4) are appropriate for certification because such claims present particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE/ NEGLIGENCE PER SE

72.     Plaintiff hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

73.     Defendant owed a duty of care to Plaintiff and Class members to use reasonable means to secure and safeguard the entrusted PII, to prevent its unauthorized access and disclosure to third parties, to guard it from theft, and to detect any attempted or actual breach of its systems. These common law duties existed because Plaintiff and Class members were the foreseeable and probable victims of any inadequate security practices. In fact, not only was it foreseeable that Plaintiff and Class members would be harmed by the failure to protect their PII because hackers routinely attempt to steal such information and use it for nefarious purposes, but Defendant knew that it was more likely than not Plaintiff and Class members would be harmed by such exposure of their PII.

74.     Defendant's duties to use reasonable data security measures also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect PII. Various FTC publications and data security breach orders further form the basis of Defendant's duties. In addition, individual states have enacted statutes based upon the FTC Act that also created a duty.

75.     Defendant's violations of Section 5 of the FTC Act constitute negligence per se.

76.    Defendant breached the aforementioned duties when it failed to use security practices that would protect the PII provided to it by Plaintiff and Class members, thus resulting in unauthorized third-party access to the Plaintiff's and Class members' PII.

77.    Defendant further breached the aforementioned duties by failing to design, adopt, implement, control, manage, monitor, update, and audit its processes, controls, policies, procedures, and protocols to comply with the applicable laws reasonable standards of care necessary to safeguard and protect Plaintiff's and Class members' PII within its possession, custody, and control.

78.    As a direct and proximate cause of failing to use appropriate security practices, Plaintiff's and Class members' PII was disseminated and made available to unauthorized third parties.

79.    Defendant admitted that Plaintiff's and Class members' PII was wrongfully disclosed as a result of the breach.

80.    The breach caused direct and substantial damages to Plaintiff and Class members, as well as the possibility of future and imminent harm through the dissemination of their PII and the greatly enhanced risk of credit fraud or identity theft.

81.    By engaging in the forgoing acts and omissions, Defendant committed the common law tort of negligence. For all the reasons stated above, Defendant's conduct was negligent and departed from reasonable standards of care including by, but not limited to: failing to adequately protect the PII; failing to conduct regular security audits; and failing to provide adequate and appropriate supervision of persons having access to Plaintiff's and Class members' PII.

82.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and the Class, their PII would not have been compromised.

83.     Neither Plaintiff nor the Class contributed to the breach or subsequent misuse of their PII as described in this Complaint. As a direct and proximate result of Defendant's actions and inactions, Plaintiff and the Class have been put at an increased risk of credit fraud or identity theft, and Defendant has an obligation to mitigate damages by providing adequate credit and identity monitoring services. Defendant is liable to Plaintiff and the Class for the reasonable costs of future credit and identity monitoring services for a reasonable period of time, substantially in excess of one year. Defendant is also liable to Plaintiff and the Class to the extent that they have directly sustained damages as a result of identity theft or other unauthorized use of their PII, including the amount of time Plaintiff and the Class have spent and will continue to spend as a result of Defendant's negligence. Defendant is also liable to Plaintiff and the Class to the extent their PII has been diminished in value because Plaintiff and the Class no longer control their PII and to whom it is disseminated. Defendant is further liable to Plaintiff and the Class to the extent that they have suffered anxiety and emotional distress as a result of their heightened risk of becoming victims of credit fraud and identity theft.

## COUNT II
## INVASION OF PRIVACY

84.     Plaintiff hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

85.     Plaintiff and Class members have objective reasonable expectations of solitude and seclusion in their personal and private information and the confidentiality of the content of personal information and non-public medical information.

86.     Defendant invaded Plaintiff's and the Class's right to privacy by allowing the unauthorized access to their PII and by negligently maintaining the confidentiality of Plaintiff's and the Class's PII, as set forth above.

87.    The intrusion was offensive and objectionable to Plaintiff, the Class, and to a reasonable person of ordinary sensibilities in that Plaintiff's and the Class's PII was disclosed without prior written authorization from Plaintiff and the Class.

88.    The intrusion was into a place or thing which was private and is entitled to be private, in that Plaintiff and the Class provided and disclosed their PII to Defendant privately with an intention that the PII would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class were reasonable to believe that such information would be kept private and would not be disclosed without their written authorization.

89.    As a direct and proximate result of Defendant's above acts, Plaintiff's and the Class's PII was viewed, distributed, and used by persons without prior written authorization and Plaintiff and the Class suffered damages as described herein.

90.    Defendant is guilty of oppression, fraud, or malice by permitting the unauthorized disclosure of Plaintiff's and the Class's PII with a willful and conscious disregard of their right to privacy.

91.    Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause Plaintiff and the Class severe and irreparable injury in that the PII maintained by Defendant can be viewed, printed, distributed, and used by unauthorized persons. Plaintiff and the Class have no adequate remedy at law for the injuries in that a judgment for the monetary damages will not end the invasion of privacy for Plaintiff and the Class, and Defendant may freely treat Plaintiff's and the Class's PII with sub-standard and insufficient protections.

## COUNT III
## UNJUST ENRICHMENT

92.    Plaintiff hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

93.    Plaintiff and the Class have an interest, both equitable and legal, in their PII that was conferred upon, collected by, and maintained by Defendant and that was ultimately compromised in the data breach.

94.    Defendant, by way of its acts and omissions, knowingly and deliberately enriched itself by saving the costs it reasonably should have expended on cybersecurity measures to secure Plaintiff's and the Class's PII.

95.    Defendant also understood and appreciated that the PII pertaining to Plaintiff and the Class was private and confidential and its value depended upon Defendant maintaining the privacy and confidentiality of that PII.

96.    Instead of providing for a reasonable level of security that would have prevented the breach—as is common practice among companies entrusted with such PII—Defendant instead made a conscious and opportunistic calculation to increase its own profits at the expense of Plaintiff's and the Class's security. Nevertheless, Defendant continued to obtain the benefits conferred on it by Plaintiff and the Class. The benefits conferred upon, received, and enjoyed by Defendant were not conferred officiously or gratuitously, and it would be inequitable and unjust for Defendant to retain these benefits.

97.    Plaintiff and the Class suffered as a direct and proximate result. As a result of Defendant's decision to profit rather than provide requisite security, and the resulting breach disclosing Plaintiff's and the Class's PII, Plaintiff and the Class suffered and continue to suffer considerable injuries in the forms of, *inter alia,* attempted identity theft, time and expenses

mitigating harms, diminished value of PII, loss of privacy, increased risk of harm, and severe anxiety and emotional distress.

98.    Thus, Defendant engaged in opportunistic conduct in spite of its duties to Plaintiff and the Class, wherein it profited from interference with Plaintiff's and the Class's legally protected interests. As such, it would be inequitable, unconscionable, and unlawful to permit Defendant to retain the benefits it derived as a consequence of its conduct.

99.    Accordingly, Plaintiff, on behalf of himself and the Class, respectfully request that this Court award relief in the form of restitution or disgorgement in the amount of the benefit conferred on Defendant as a result of its wrongful conduct, including specifically, the amounts that Defendant should have spent to provide reasonable and adequate data security to protect Plaintiff's and the Class's PII, and/or compensatory damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for a judgment against Defendant as follows:

a.    For an order certifying the proposed Class, appointing Plaintiff as Representative of the proposed Class, and appointing the law firms representing Plaintiff as counsel for the Class;

b.    For compensatory and punitive and treble damages in an amount to be determined at trial;

c.    Payment of costs and expenses of suit herein incurred;

d.    Both pre-and post-judgment interest on any amounts awarded;

e.    Payment of reasonable attorneys' fees and expert fees;

f.    Such other and further relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury.

Dated: June 17, 2024                          Respectfully Submitted,

                                              *s/ Joe Kendall*
                                              JOE KENDALL
                                              Texas Bar No. 11260700
                                              **KENDALL LAW GROUP, PLLC**
                                              3811 Turtle Creek Blvd., Suite 825
                                              Dallas, Texas 75219
                                              Phone:214-744-3000
                                              Fax: 214-744-3015
                                              jkendall@kendalllawgroup.com

                                              *Interim Local Counsel for Plaintiff and the*
                                              *Putative Class*

                                              Jeffrey S. Goldenberg (*pro hac vice forthcoming*)
                                              **GOLDENBERG SCHNEIDER, LPA**
                                              4445 Lake Forest Drive, Suite 490
                                              Cincinnati, Ohio 45242
                                              Telephone: (513) 345-8291
                                              jgoldenberg@gs-legal.com

                                              Charles E. Schaffer (*pro hac vice forthcoming*)
                                              **LEVIN SEDRAN & BERMAN**
                                              510 Walnut Street, Suite 500
                                              Philadelphia, PA 19106
                                              Telephone: (215) 592-1500
                                              cschaffer@lfsblaw.com

                                              **LEEDS BROWN LAW, P.C.**
                                              Jeffrey K. Brown (*pro hac vice forthcoming*)
                                              Brett R. Cohen (*pro hac vice forthcoming*)
                                              One Old Country Road, Suite 347
                                              Carle Place, NY 11514-1851
                                              Tel: (516) 873-9550
                                              jbrown@leedsbrownlaw.com
                                              bcohen@leedsbrownlaw.com

                                              *Counsel for Plaintiff and the Putative Class*